# United States Court of Appeals
## For the First Circuit

No. 03-2073
No. 04-1424

UNITED STATES OF AMERICA,

Appellee,

v.

EDISON MISLA-ALDARONDO,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Howard, Circuit Judge,

Stahl and Baldock,* Senior Circuit Judges.

Laura Maldonado Rodríguez for appellant.
Thomas M. Gannon, Attorney, Appellate Section, Civil
Division, U.S. Department of Justice, with whom Rosa E.
Rodríguez-Velez, United States Attorney, and Nelson Perez-Sosa,
Assistant United States Attorney, were on brief, for appellee.

March 2, 2007

*Of the Tenth Circuit, sitting by designation.

**STAHL**, <u>**Senior Circuit Judge**</u>.  Edison Misla Aldorando ("Misla"), the former Speaker of the Puerto Rico House of Representatives, was convicted in U.S. District Court for the District of Puerto Rico of extortion, money laundering, and witness tampering.  The charges stemmed from a scheme by a group bidding to purchase a state hospital being privatized.  The group sought, and paid for, Misla's help in securing the regulatory approval needed for the purchase.  A jury convicted Misla and he was sentenced to 71 months' imprisonment and three years' supervised release, fined $12,500, and ordered to forfeit $147,400.  Misla now appeals his conviction and sentence, and the denial of his motion for a new trial.  We affirm.

## I. Factual Background

In the late 1990s, the Puerto Rico Department of Health (PRDH) and the Government Development Bank (GDB) began privatizing the island's state-owned hospitals.  <u>See</u> P.R. Laws Ann. tit. 24, §§ 3301-3325 (repealed 2003).  Investors were identified through a competitive bidding process, with private entities with an existing hospital management contract being given an option to purchase that particular hospital without participating in any competitive bidding process.

The Dr. Alejandro Otero Lopez Hospital (HAOL) in Manatí, Puerto Rico, was a public hospital managed by Carribean Hospital Corporation (CHC).  Co-defendants Dr. José De Jesús Toro ("De

Jesús") and Dr. Alvin Ramírez Ortiz ("Ramírez") owned Carribean Anesthesia Services, Inc. (CAS), HAOL's anesthesiology provider. CAS wished to purchase HAOL, and to circumvent the bidding process it needed first to acquire CHC's management contract.

De Jesús and Ramírez hired co-defendant José Ivan Ramos Cubano ("Ramos") to assist with the purchase of the CHC contract and, ultimately, HAOL in exchange for consulting fees of $15,000 per month and a partnership in their company. The first step, the purchase of the CHC contract, required the approval of PRDH. Ramos arranged for a meeting with co-defendant José Gerardo Cruz Arroyo ("Cruz"), the head of PRDH's legal division. Ultimately, Cruz would take a bribe in order to allow CAS to purchase CHC's contract to manage HAOL.

The next step was obtaining GDB's approval for the purchase of HAOL outright. Ramos testified that he solicited the assistance of Misla because Misla had a close relationship with Marcos Rodríguez Ema ("Rodríguez"), GDB's president. Misla agreed to help secure GDB's approval in exchange for payment. Ramos also testified that Misla, in furtherance of the agreement, arranged meetings between CAS and Rodríguez that CAS could not have otherwise obtained. Ramos's testimony was corroborated by that of Ramírez.

In October 1997, an independent law firm engaged by GDB recommended that CAS be deemed ineligible to purchase HAOL because

-3-

CAS owed an outstanding debt to PRDH. Regardless, Rodríguez ordered the privatization committee to accept CAS's offer of $14 million for HAOL and to arrange for CAS to repay the outstanding debt at a future date. The sale of HAOL to CAS was completed on September 17, 1998.

Between August and October 1998, Ramos transferred approximately $147,400 from HAOL -- now managed by CAS -- to Misla by cashing checks and furnishing the proceeds directly to Misla or his associates.

In May 2001, Puerto Rico's Justice Department began investigating the transaction and eventually Misla. In October 2001, Ramos agreed to cooperate with the government and record his conversations with Misla. While being recorded, Misla suggested, among other things, that Ramos leave the country for a while; that they come up with a cover story for the payments; and that he, Misla, would work to stall or stop the investigation.

On October 25, 2001, Misla was indicted for extortion, money laundering, and witness tampering. Following a jury trial, Misla was convicted on five of the six charges.[1] On June 20, 2003, the district court sentenced Misla to concurrent terms of 71 months' imprisonment for each conviction and three years'

---

[1] He was not convicted on Count 5, one of the extortion charges.

supervised release.  The court also ordered him to forfeit the $147,400 paid to him by Ramos.

Additional facts relevant to the various issues on appeal are recited below.

## II. Discussion

## A. Pretrial Motions

### 1. Background

The indictment, as well as unrelated charges against Misla for sexual assault on a minor, generated considerable pretrial publicity.  The publicity included posters put up throughout San Juan bearing Misla's photograph and the caption, "Stealing Prohibited: the Government does not admit competitors."[2]  Alleging that this pretrial publicity was prejudicial, Misla moved for a change of venue to the Virgin Islands and, in the alternative, a 90-day continuance to allow for any pretrial publicity to subside.  Misla also requested expanded jury voir dire.

The district court denied all motions, but conducted individualized voir dire over a five-day period.  Misla submitted a list of 84 proposed voir dire questions to the court.  The court selected several of Misla's proposed questions, including questions concerning pretrial publicity, the sexual assault charges pending against Misla, and whether the jurors believed Misla to be a

---

[2]This is the translation as provided by the defendant.

corrupt politician. During voir dire, Misla requested five additional peremptory challenges. He renewed his request at the close of voir dire. Both motions were denied.

Of the 84 jurors interviewed, 13 were excused for possible bias. After the completion of voir dire, Misla challenged an additional eight jurors for cause. The district court denied the challenges. Ultimately, the final petit jury contained only one of the jurors that had been challenged by Misla.[3]

We review a district court's decisions on motions for change of venue, continuance, expanded voir dire, and additional peremptory challenges for abuse of discretion. See United States v. Brandon, 17 F.3d 409, 441 (1st Cir. 1994) (change of venue); United States v. Rodríguez-Marrero, 390 F.3d 1, 21-22 (1st Cir. 2004) (continuance); United States v. Anagnos, 853 F.2d 1, 5 (1st Cir. 1988) (expanded voir dire); United States v. Marrero-Ortíz, 160 F.3d 768, 776 (1st Cir. 1998) (peremptory challenges) (citing United States v. Cox, 752 F.2d 741, 748 (1st Cir. 1985)).

### 2. Change of Venue

A change of venue is proper if the court determines that there exists "so great a prejudice against the defendant . . . in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). In making

---

[3]This juror, number 80, was challenged because he had expressed his understanding that, as a matter of statistics, most defendants are found guilty at trial.

this determination, we ask 1) whether the degree of inflammatory publicity had so saturated the community such as to make it "virtually impossible to obtain an impartial jury," United States v. McNeill, 728 F.2d 5, 9 (1st Cir. 1984), or 2) if prejudice cannot be presumed, whether nonetheless the empaneled jury was actually prejudiced against the defendant. See United States v. Rodríguez-Cardona, 924 F.2d 1148, 1158 (1st Cir. 1991); United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990). Misla does not argue actual juror prejudice on appeal, and so we review only for whether prejudice should have been presumed from the extent of the pretrial publicity.

A presumption of prejudice is reserved for those extreme cases where publicity is "both extensive and sensational in nature." Id. Merely a high volume of media coverage is not sufficient to presume prejudice, if that coverage is factual, as opposed to inflammatory. Id.; see Brandon, 17 F.3d at 441. A court may judge the partiality of the community by looking to the "length to which the trial court must go in order to select jurors who appear to be impartial." Murphy v. Florida, 421 U.S. 794, 802-03 (1975). In general, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Dobbert v. Florida, 432 U.S. 282, 302 (1977) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)). But when a large percentage of the venire is disqualified, this

evidence of prejudice in the community may lead a court to "properly question the remaining jurors' avowals of impartiality." Angiulo, 897 F.2d at 1181-82 (citing Murphy, 421 U.S. at 802-03).

The publicity surrounding this case was undoubtedly extensive. Misla had been the Speaker of the Puerto Rico House of Representatives and was simultaneously being investigated on charges of sexual assault on a minor. To address this, the district court conducted an extensive and individualized voir dire, taking 15 to 25 minutes with each juror and asking each upwards of 50 questions.

The questions were substantially the same for all jurors and covered subjects such as: the jurors' own beliefs in Misla's guilt or innocence; which newspapers they read, radio stations they listened to, and television stations they watched; whether they had read particular newspaper articles or columns; whether they had listened to the comments of the Secretary of Justice; whether they had participated in, or listened to the results of, any radio polls; whether they had discussions with others about the case; whether they were members of a political party; and whether they had views about the corruption of politicians in general, and Misla and his party in particular. The district court further inquired into whether the jurors or any close friends or family members had ever been a victim of rape or sexual molestation. The district

court also inquired extensively into the jurors' understanding of the presumption of innocence and the burden of proof.

In the end, only 13 out of 84 jurors were excused for possible bias. This rate of disqualification, roughly 15 percent, is too low to be sufficient to presume prejudice in the community. See Murphy, 421 U.S. at 803 (no prejudice presumed where around 25 percent of venire "indicated an opinion" as to guilt); Brecheen v. Reynolds, 41 F.3d 1343, 1351 (10th Cir. 1994) (25% of venire excluded "for cause"); United States v. Moreno Morales, 815 F.2d 725, 735 (1st Cir. 1987) (25% of venire "admitted . . . to believing that defendants were guilty"); accord Irvin, 366 U.S. at 727 (prejudice presumed where 90% of venire "entertained some opinion as to guilt"). Even if we include the eight additional jurors that Misla challenged for cause (but which the judge found were not biased), the percentage would only be 25 percent.

While a low percentage of disqualification is not a safe harbor against a finding of prejudice, it is strong evidence against it. But it may nonetheless be countered by persuasive direct evidence of the level of saturation of inflammatory publicity. See Rodríquez-Cardona, 924 F.2d at 1158. Here, Misla provided the district court with, by his count, over 180 articles attempting to show such saturation, and the court nonetheless held that change of venue was not necessary given the extensive voir

dire that was planned.[4]   Misla does not now point us to any
specific evidence that would lead us to believe that the judge
abused her discretion in denying the motion, especially given the
success of the voir dire.[5]   Accord Rideau v. Louisiana, 373 U.S.
723 (1963) (holding, in reversing conviction based solely on
pretrial publicity without a finding of actual prejudice in jurors,
that television broadcast of filmed confession seen by two-thirds
of the community necessitated a presumption of prejudice) (cited in
Moreno Morales, 815 F.2d at 735-36).

### 3. Continuance

"We grant 'broad discretion' to a trial court to decide
a continuance motion and will only find abuse of that discretion
with a showing that the court exhibited an 'unreasonable and
arbitrary insistence upon expeditiousness in the face of a
justifiable request for delay.'"   United States v. Rodríguez-
Marrero, 390 F.3d 1, 21-22 (1st Cir. 2004) (quoting United States
v. Rodríguez Cortes, 949 F.2d 532, 545 (1st Cir. 1991)).   "Among
the factors to be considered in reviewing a denial of a motion for
a continuance are . . . the defendant's diligence, the

---

[4]In denying Misla's motion for reconsideration of the denial
of the motion for change of venue, the district court said that it
would reconsider the issue of venue if the voir dire was
unsuccessful.

[5]Misla argues, incorrectly, that the district court denied the
change of venue motion because it was filed close to the beginning
of trial.  In fact, that reason was raised only in the denial of
the certification to appeal.

inconvenience to the court and other parties, the likely utility of a continuance, and any unfair prejudice caused by the denial." United States v. Orlando-Figueroa, 229 F.3d 33, 40 (1st Cir. 2000).

Here, Misla argues for a continuance only on the grounds of pretrial publicity, which, as discussed above, was sufficiently addressed by the voir dire. With that issue dealt with, denying the motion for continuance was not an unreasonable or arbitrary insistence on expeditiousness, and thus the judge did not abuse her discretion.

### 4. Expanded Voir Dire

Misla is imprecise in his objection to the voir dire procedures. In his brief, Misla at times seems to be saying that the voir dire should have been expanded to allow more of his questions to be asked. At other times, he seems to be arguing that the questions that were asked were prejudicial (which, if true, would not be solved by expanding the number of questions). The latter argument has no merit since the questions Misla complains of here, relating to sexual molestation, were precisely those that he requested be asked.

The former argument, that the voir dire should have been expanded yet further beyond the already expanded voir dire that the court conducted, also fails. In deciding on the manner in which to conduct voir dire, the court "has broad discretion . . . subject only to the essential demands of fairness. It need not permit

-11-

counsel to dominate the process, nor pose every voir dire question requested by a litigant." Real v. Hogan, 828 F.2d 58, 62 (1st Cir. 1987) (citation omitted).

The only specific question Misla says should have been asked was one regarding whether the jurors were talking about the case among themselves while awaiting voir dire. The judge denied the particular question as being too open-ended and not probative of whether the particular juror being questioned had talked about it in a way that might have influenced the juror's opinion of Misla's guilt. The judge said that the existing voir dire questions adequately delved into that area. We agree. The judge did a thorough job of probing for bias and Misla is far from making the required showing that the lack of this question or others prejudiced him.[6] See Murphy, 421 U.S. at 803; see also United States v. Casas, 425 F.3d 23, 48-49 (1st Cir. 2005) (lengthy individualized voir dire sufficient to overcome any prejudice as a result of juror communications with third party).

5. Additional Peremptory Challenges

Misla asked for, and was denied, five additional peremptory challenges. Misla argues, essentially, that he was owed more peremptory challenges because he had been denied several of his for-cause challenges. To the degree that this is a roundabout

---

[6] In addition to the lack of any evidence of actual prejudice on the part of the jury, we note the additional fact that the jury empaneled through this process actually acquitted Misla on Count 5.

attempt to challenge those for-cause denials, it fails. "'There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empaneling of a jury.'" United States v. González-Soberal, 109 F.3d 64, 69-70 (1st Cir. 1997) (quoting United States v. McCarthy, 961 F.2d 972, 976 (1st Cir. 1992)). Misla raises no other substantive argument for why more peremptory challenges were required. Given that he did not use any of his allotted ten challenges on the cause-challenged jurors, we fail to see the connection, particularly since, again, there has been no claim of actual prejudice among the petit jury members. There was no abuse of discretion.

## B. Ramos-Pubill Connection

### 1. Background

During trial on December 4, 2002, counsel for Misla was cross-examining Ramos, the government's cooperating witness. Seeking to impeach him, counsel asked Ramos about several different bad acts allegedly attributable to him. In one particular exchange, counsel asked Ramos about an investment of $300,000 he'd taken from a gas station owner named Eduardo Pubill to invest on his behalf in a company called Telefónica Hispanoamericano. It turned out that Eduardo Pubill's son, Edgardo, was a convicted drug trafficker, and that it was likely that the $300,000 were proceeds of illegal drug sales that Edgardo was seeking to launder through

-13-

his father's gas station and the Telefónica Hispanoamericano investment.

Counsel for Misla challenged Ramos on whether he knew that he was laundering money, but Ramos denied knowing the source of the money, saying that he simply believed that an owner of a gas station would be likely to have excess cash to invest. At sidebar, the government said that Ramos had only discovered the illegal source of the funds while being debriefed by then-U.S. Attorney Guillermo Gil in preparation for trial in this case. Gil, having worked on the prosecution of Edgardo Pubill, was aware of the gas station in question because he had attempted to seek its forfeiture, since it was likely a front for Edgardo's drug trafficking. The district court ordered the government to look into the Ramos-Pubill transaction further, and any other potential activities or cases involving Eduardo Pubill, the father.

Two days later, on December 6, 2002, the prosecution reported that Eduardo Pubill had no federal convictions. The court then ordered the prosecution to obtain official certification from federal investigating agencies, such as the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the U.S. Customs Service, as to whether there was any evidence that Ramos laundered money for Eduardo Pubill or his son, Edgardo.

On December 9, 2002, the judge, having inquired with the Probation Office, reported that Eduardo Pubill did in fact have a

prior conviction, in case no. 92-194.  On the same date, the court issued an order requiring the FBI, DEA, Customs Service, and Internal Revenue Service to produce any interview or investigation reports related to case no. "92-094," against Eduardo Pubill, and no. "91-299," against Edgardo Pubill, that referenced Ramos or Telefónica Hispanoamericana.  Unbeknownst to the court or counsel, case no. 92-194 was incorrectly cited on the order as no. 92-094.  Perhaps because of this error, no further information about a conviction of Eduardo Pubill was discovered.

Upon learning of the court's order, Deputy U.S. Marshal Roberto Vizcarrondo recalled an interview he had done with an informant named Pedro Torres Molano ("Torres") on December 4, 2001, when Vizcarrondo was detailed to the FBI Intelligence Research Center, in which Torres had stated that he had helped to launder the Pubills' money through Ramos, and that Ramos was well aware of the source of the funds.  On December 11, 2002, he forwarded the draft Form 302 interview sheet ("Form 302"), in which he had earlier written the details of the conversation, to FBI agent José Figueroa.  The next day, the Form 302 was provided to the court by FBI agent Jane Erickson.  She noted that the Form 302 was not related to the case numbers referenced in the court's December 9 order, but was relevant to Ramos and Telefónica Hispanoamericano.

After an inspection of the document, the court issued a subsequent order that: (1) indicated that the newly discovered Form

302 was relevant to witness Ramos; (2) included a redacted copy of the Form 302; and (3) granted Misla a continuance until December 17, 2002.

Torres was called to testify, and in his testimony on December 20, 2002, he stated that he informed Ramos that "supposedly the money came from an illegal source." Tr. 12/20/02 at 44. Soon after that, the court interrupted the testimony to hold an evidentiary hearing to determine whether Misla could also use the Form 302 to impeach Ramos. During the evidentiary hearing, Vizcarrondo, FBI Special Agent Judith Priegues-López ("Priegues"), and FBI Agent Carlos Hernández testified that the Form 302 was created but never indexed or uploaded to the central server where other agents would have been able to query the form. They also testified that Vizcarrando had originally provided the Form 302 to Priegues, who then hand-delivered a disk with the interview to Hernández's office after telling him by phone to expect it. Hernández testified that he recalled the conversation with Priegues, but that he never received the disk, and did not follow up with Priegues when it did not appear.

Misla then moved to have the jury discharged and the indictment dismissed, alleging prosecutorial misconduct. Misla argued that Hernández had been present during Ramos's testimony and remained silent despite remembering his conversation with Priegues about the Form 302. The district court denied the motion ruling

that, while Misla had difficulty obtaining the impeachment material, he now had the material and could make effective use of it.

The testimony of Torres resumed after the close of the evidentiary hearing. Torres was allowed to review the Form 302, and he clarified his earlier testimony by further stating that he "told Ramos . . . that it was being said that the money coming from Pubil[l] were proceeds of drugs." Tr. 12/20/02 at 163.

The trial continued on December 26, 2002. Misla recalled Ramos and cross-examined him regarding his prior testimony about the transaction with Eduardo Pubill. Misla also moved that day to question both Hernández and Priegues regarding the Form 302, stating that such testimony would allow the jury to make inferences regarding the government's intention to withhold impeachment material.

On January 14, 2003, the district court denied Misla's motion to question Hernández and Priegues. The court stated that Misla was merely attempting to demonstrate prosecutorial misconduct, and that such evidence was not relevant to impeaching Ramos. Trial continued from that point, and a verdict was reached.

On October 9, 2003, nearly nine months after the jury had returned a verdict, the prosecution filed an informative motion stating that Eduardo Pubill, the source of the money that Ramos invested in the Telefónica Hispanoamericano stock, had been

previously convicted in federal court of structuring financial transactions to avoid reporting requirements, in violation of 31 U.S.C. § 5324. The motion stated that the government was filing the motion because this information was contrary to the government's assertion at trial that Eduardo Pubill had no convictions. The government explained this lapse by saying that earlier database searches by several agencies had turned up nothing except for the conviction of Eduardo's son, Edgardo Pubill. The case number for this conviction was 92-194, which, as discussed above, had been erroneously given as 92-094 in the district court's order seeking more information on Pubill.

Misla moved to dismiss the indictment or, in the alternative, for a new trial. He argued that the failure to disclose Eduardo Pubill's conviction earlier was prosecutorial misconduct that denied him the chance to fully impeach Ramos, the government's main witness. The district court denied the motion, saying that even without the record of Eduardo Pubill's conviction, there was ample material with which to impeach Ramos, including the testimony of Torres. The district court also stated that it would have been straightforward for Misla to discover the error in the case number and bring it to court's attention.

## 2. The Form 302 Interview

We review for abuse of discretion a district court's decision on how to handle a delayed disclosure. United States v. Catano, 65 F.3d 219, 227 (1st Cir. 1995).

Prior to trial, Misla sought discovery under Giglio v. United States, 405 U.S. 150 (1972), of information potentially useful in impeaching government witnesses. Under Giglio, the withholding of such impeachment information would fall under the rule of Brady v. Maryland, 373 U.S. 83 (1963), that suppression of favorable evidence violates due process if the evidence is material to guilt or punishment. Giglio, 405 U.S. at 154. Where the evidence is never forthcoming, we ask whether that nondisclosure "might have affected the outcome of the trial." United States v. Agurs, 427 U.S. 97, 104 (1976). However, where the evidence is only delayed, we ask instead "whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986); see Catano, 65 F.3d at 227.

To prevail on this argument, the defendant must at a minimum make "a prima facie showing of a plausible strategic option which the delay foreclosed." United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990); see United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir. 2002). Misla has made no such showing here.

Instead, he argues only that the circumstances of the disclosure imply an attempt by the government to deliberately keep the information from Misla. Even if that were true, it is not sufficient to force a mistrial where the defendant is not prejudiced. "The critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect." Devin, 918 F.2d at 290.

The district court found that the delayed disclosure had no effect, since Misla was still able to use the information to impeach Ramos. Indeed, Misla appears to have been fully aware of the allegations contained in the Form 302 prior to trial, since the allegations of money laundering first came to light through his counsel's cross-examination of Ramos. Given this, we fail to see how Misla was prejudiced by the delayed disclosure of the Form 302 interview with Torres.

Misla also challenges the district court's ruling to disallow the testimony of Hernández and Priegues, the FBI agents who had originally handled the Form 302. The court stated that testimony regarding an alleged cover-up was not relevant to the case, especially given that Misla already had the Form 302 admitted into evidence to use to impeach Ramos. Misla argues that the fact of any government cover-up would have bolstered his argument that Ramos was lying about laundering the Pubill money.

It may be that this ruling should be reviewed as a typical evidentiary matter, rather than as a ruling on a possible sanction for a Brady violation, but regardless our review is solely for abuse of discretion. United States v. Guerrier, 428 F.3d 76, 79 (1st Cir. 2005) (as to evidentiary ruling); Catano, 65 F.3d at 227 (as to decision on delayed disclosure). For the same reasons as discussed above, we find no such abuse here.

### 3. The Eduardo Pubill Conviction

Following the government's informative motion of October 9, 2003, regarding Eduardo Pubill's conviction for structuring financial transactions to avoid reporting requirements, Misla moved to dismiss the indictment or, in the alternative, for a new trial. The judge denied the motion.

This issue presents a slight puzzle with respect to our standard of review, though it is easily resolved. The denial of the motion appears to be subject to our review under the standards given in Brady and Gigilio, just as the delayed disclosure of the Form 302 interview with Torres was, as discussed above. The government's informative motion describes this as a case of nondisclosure, which would subject them to a relatively tough standard of review if we were to review under Brady. See Agurs, 427 U.S. at 104 (whether disclosure "might have affected the outcome of the trial"). However, it's not clear that this is nondisclosure -- or even delayed disclosure -- since the court

-21-

informed both parties on December 9, 2002, during trial, of exactly this conviction. The trouble arises because of the court's error in noting the case as no. 92-094 rather than no. 92-194 in its December 9 order. Perhaps as a result of that clerical error, though we can't know for sure, no party seems to have followed up on that particular case, and thus no party informed the court of its error in reporting the case number.[7]

As the district court itself noted after receiving the government's informative motion,

> [t]he fact that this motion has been filed at all leads to confusion since the Court, despite the government's representation during trial that Mr. Eduardo Pubill-Rivera had not been convicted, took the initiative to probe into the matter. The result of that inquiry was the disclosure to the parties of Mr. Eduardo Pubill-Rivera's conviction and sentence. . . . We do not anticipate any controversy arising from the information provided in the government's last motion since this is not newly discovered information but rather data disclosed and utilized during the trial.

---

[7]We note that in the transcript for December 9, 2002, the case number was given correctly at one point. Tr. 12/9/02 at 4. Therefore, it would have been a simple matter for the mistake to be corrected. We have not found any reference in the transcripts, nor have the parties pointed us to one, where the parties reported pursuing the mistakenly cited case no. 92-094 and discovering that it was unrelated to Pubill.

It's not entirely clear from the record why what should have been a routine matter of searching conviction records was so fraught with difficulty. In addition to the judge's clerical error in reporting the case number, some confusion about names may have played a role. In the instant case, Eduardo and Edgardo's surname is given as "Pubill," but in the transcripts the parties also used "Pubil" and "Purill." The indictment and judgment of Edgardo also used "Pubil."

Sealed Order, October 10, 2003.  We agree with the district court's reasoning.  This is at worst an instance of delayed disclosure, since the information came out during trial, and thus we again ask "whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case."  Ingraldi, 793 F.2d at 411-12.  Our standard of review of the denial of the motion is, again, abuse of discretion.[8]

---

[8]The government's brief would have us review the denial of a new trial under the standards of Fed. R. Crim. P. 33, rather than Brady, presumably because they would classify the evidence of Pubill's conviction as "newly discovered" rather than as something known to the government but not disclosed.  If it were true that the conviction had never been disclosed, this distinction would be important.  We would find an abuse of discretion in the denial of a motion for a new trial under Rule 33 only if the new evidence created an "actual probability that an acquittal would have resulted if the evidence had been available."  United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993).  On the other hand, we would find an abuse of discretion in the denial of a new trial for a Brady violation if the new evidence merely created a "reasonable probability that the evidence would have changed the result."  United States v. Josleyn, 206 F.3d 144, 151 (1st Cir. 2000).  "The standard applied to new trial motions based on Brady violations is thus more favorable to defendants."  Id.  However, because the disclosure was at worst delayed, rather than nonexistent, our review standards are substantially equivalent. See United States v. Osorio, 929 F.2d 753, 758 (1st Cir. 1991) (noting that standard of review for delayed disclosure under Ingraldi is essentially one of prejudice).

This spares us the difficulty of determining whether the government can "newly discover" a conviction that it itself secured.  Cf. Kyles v. Whitley, 514 U.S. 419, 437 (1995) (holding that "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" (emphasis added)); Osorio, 929 F.2d at 761 (applying Brady to evidence of a witness's drug dealing that was not known to prosecutor, but known to others in his office, and holding that the "prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant

-23-

Catano, 65 F.3d at 227. We find no such abuse here, simply because Misla was not prevented from preparing by the delay. In his brief, Misla constructs an unlikely string of events: knowledge of Eduardo Pubill's conviction for a financial crime would have led to him being called to testify; he would then have disclosed the money laundering scheme with Ramos; the judge would have been forced to instruct the jury that Ramos was a perjurer; and this would have so undermined his credibility, as the government's main witness, as to make conviction of Misla impossible. This is inference piled upon inference, particularly since Ramos had already been impeached over the Pubill connection (not to mention his own involvement in the conspiracy at issue in the instant case). More fundamentally, because Misla was provided this information during trial, but apparently did not pursue it, we cannot say that the delay caused any prejudice.

Finally, it should not be forgotten that Ramos was the witness, not Pubill. While prior convictions of Ramos would clearly be material under Giglio, it is not so clear that the conviction of a person with whom that witness did business is also material. At some point, the human chain of bad behavior becomes too attenuated to be relevant to the trial at hand. Here, however,

---

knowledge"). But cf. United States v. Bender, 304 F.3d 161, 164 (1st Cir. 2002) (stating, in dictum, that duties under Brady may be required only of those such as "members of the prosecuting team, including police investigators working for the prosecution").

we are not called upon to make that determination, because in any event Misla was not prejudiced. Therefore, the judge did not abuse her discretion.

## C. Ramírez Testimony

Misla next argues that the district court should have struck the testimony of Alvin Ramírez, one of the CAS principals, on the grounds that he lacked personal knowledge. Because this was an evidentiary ruling to which Misla objected, our review is for abuse of discretion. United States v. Brown, 450 F.3d 76, 78 (1st Cir. 2006). Even if the court erred, we will not reverse if the error is harmless. Id. at 79; see United States v. García-Morales, 382 F.3d 12, 17 (1st Cir. 2004) (error is harmless "if it is highly probable that the error did not influence the verdict").

Ramírez testified about seeing checks from HAOL to Ramos that ultimately ended up in the hands of Cruz and Misla. Ramírez testified several times, however, that he did not know at the time about the intended use of these specific checks, but only found out when the government showed him the evidence that they had gathered during their investigation. Defense counsel objected, but the district judge allowed the testimony, saying that Misla was free to cross-examine Ramírez about the source of his knowledge.

Misla's argument is thinly developed, and he cites to no particular rule of evidence or cases supporting the proposition

that to have allowed this testimony is reversible error.[9] We decline now to explore all the possible interpretations of the argument since, in any event, any potential error was harmless. Despite not knowing the specific purpose of the funds, Ramírez testified -- based on his personal knowledge -- that he saw the checks; that he knew that Ramos intended to pay Misla; that Ramos told him that "nothing in life is free and everything costs money," tr. 11/25/02 at 16; and that he assumed that the meeting they were able to secure with Misla "was [not] a favor that was done just to help us," id. at 61. Furthermore, the jury heard explicitly about the source of his knowledge, whether it came during the events in question or only during later litigation, and thus had a sufficient basis to judge his credibility. Finally, the other evidence against Misla was substantial. Given this, even if it were error to allow the testimony, any error was harmless. See Fed. R. Crim. P. 52(b).

**D. Insufficient Evidence as to Counts 2, 3, 4, and 6**

Misla contends that the district court erred in not dismissing Counts 2 (Hobbs Act extortion, 18 U.S.C. § 1951(a)), 3,

---

[9]United States v. Falu-González, 205 F.3d 436 (1st Cir. 2000), the one case that Misla does point us to, is inapposite. In that case, a witness testified to knowing about some sales of drugs, but in fact had not observed the sales and had only been told of them by another. The judge allowed the testimony as an admission of a co-conspirator, and thus admissible under an exception to the hearsay rule. Id. at 438; see Fed. R. Evid. 802(d)(2)(E). That analysis is not relevant here.

-26-

4 (two counts of conspiring to launder money, 18 U.S.C. § 1956(a)(1)(B)(i), (a)(3)(A) & (B), and (h)), and 6 (witness tampering, 18 U.S.C. § 1512). He avers that there was insufficient evidence to sustain a guilty verdict on each count. We review attacks on the sufficiency of evidence supporting jury verdicts de novo. United States v. Washington, 434 F.3d 7, 15 (1st Cir. 2006). In doing so, we review the evidence "in the light most favorable to the prosecution," considering whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.

### 1. Count 2

To challenge his conviction for extortion under color of official right, Misla latches onto a clerical error in the indictment. The indictment names Count 2 as "Interference with Commerce by Extortion Induced by Economic Fear and Under Color of Official Right" (emphasis added). Therefore, Misla argues, the government was bound to prove both economic fear and color of official right, not just one or the other, which is all that the statue requires. See 18 U.S.C. § 1951(b)(2) ("The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right" (emphasis added)).[10]

---

[10]Count 1, charging conspiracy to commit extortion, did not contain this misstatement, saying instead "Economic Fear and/or Under Color of Official Right." Misla does not appeal his

We have held that:

> Where a statute . . . sets forth several different means by which an offense may be committed, it is permissible for a count in an indictment to allege all or several of these means in the conjunctive.  A conviction on such a count will stand if the evidence establishing one or more of the means of commission alleged is sufficient to support a jury verdict.

United States v. Garcia-Torres, 341 F.3d 61, 66 (1st Cir. 2003) (quoting United States v. Barbato, 471 F.2d 918, 922 n.3 (1st Cir. 1973)).[11]

Working from the incorrect assumption that the government had to prove both elements, Misla argues the insufficiency only of the "economic fear" element, but does not challenge the evidence for the "under color of official right" element.  The judge correctly instructed the jury in the disjunctive (following the language of the statute, not the indictment), and thus a jury could have convicted Misla by finding "color of official right" extortion

conviction under Count 1.

[11]We note that this does not conflict with our holdings prohibiting duplicitous indictments.  See, e.g., United States v. Verrecchia, 196 F.3d 294, 297 (1st Cir. 1999) (prohibited duplicitous indictments are those that join in a single count two or more distinct offenses).  The problem with a duplicitous indictment is that a jury could convict without unanimity as to any particular offense.  Here, because Count 2 names only one offense, this is not a concern.  See United States v. Arreola, 467 F.3d 1153, 1157 (9th Cir. 2006) (noting distinction between whether "the statute at issue creates separate offenses, or simply describes alternative means to commit the same crime").

-28-

alone.  That evidence is unchallenged here and this fact is sufficient to dispose of the issue.[12]

### 2. Counts 3 and 4

Misla's challenge to the money laundering charge is that the government described the same acts as both extortion and money laundering.  Because he was charged with laundering the proceeds of the extortion, the two acts must be distinct, he argues, and therefore there was insufficient evidence to sustain a conviction for money laundering.

To prove conspiracy to commit money laundering, the government was required to show that Misla agreed with one or more co-conspirators to 1) knowingly conduct a financial transaction 2) involving funds that Misla knew to be the proceeds of some form of unlawful activity and 3) that were in fact the proceeds of a "specified unlawful activity," and 4) that Misla knew the transactions to be designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.  18 U.S.C. § 1956(a)(1)(B)(i);

---

[12]Even so, the fear element was also presented to the jury. The fear element of the statute can include fear of economic loss, including loss of future business opportunities. See United States v. Bucci, 839 F.2d 825, 827-28 (1st Cir. 1988).  The government argued at trial, and there was sufficient evidence for a jury to find, that the parties were induced to pay Misla in part for fear that, if another bidder won the right to buy HAOL, CAS's anaesthesiology contract might not be renewed.

see, e.g., United States v. Cruzado-Laureano, 404 F.3d 470, 483 (1st Cir. 2005).

"The laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime." United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000). However, this is "not a requirement that the underlying crime must be fully completed before any money laundering can begin." United States v. Castellini, 392 F.3d 35, 48 (1st Cir. 2004). The two crimes need not be "entirely separate in time." Id.

Misla argues that, until the money reached his hands, the act of extortion was not completed, and that since, once the money reached him, there was no effort to conceal it, there was no money laundering. Any of the acts that took place prior to his receiving the money, he argues, cannot suffice to be money laundering because there were no proceeds of extortion yet to conceal. The government responds that the extortion was completed when Ramos, a co-conspirator, received the funds from HAOL, Ramírez, and De Jesús, and that Ramos and Misla took steps at that point to conceal the transactions, including making some checks payable to Misla's sons and an aide.

That Misla attempted to conceal the source of the money before it actually came into his possession cannot relieve him of criminal liability for money laundering. As we said in Castellini,

focusing on simultaneity would "obscure the real principle" behind separating the offenses, viz. "that 'money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds.'" Id. at 38 (quoting United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998)). The transaction that created the proceeds -- the act of extortion -- is sufficiently distinct from the side transactions done to hide the trail -- e.g., writing checks to relatives and aides -- even if both crimes were complete only upon the arrival of the funds in Misla's hands.

Furthermore, we should not forget that here Misla was charged with conspiracy to commit both money laundering and extortion, and therefore is liable for the acts of his co-conspirators. Indeed, the indictment specifically references the facts of Count 1 (the conspiracy to extort) to describe the source of the unlawful funds applicable to both Counts 3 and 4. Since Misla is liable for the acts of his co-conspirators, such as Ramos, a reasonable jury could have found that the act of extortion was sufficiently complete upon Ramos taking control of the funds from HAOL. Any of the concealing transactions that follow thus would clearly involve proceeds of unlawful activity.

### 3. Count 6

Finally, Misla challenges his conviction for witness tampering, in violation of 18 U.S.C. § 1512(b)(1), (2), and (3). After Ramos had agreed to cooperate with the government, he

-31-

recorded conversations with Misla in which Misla discussed ways to conceal the crime, including having Ramos say that he had actually been repaying a loan to Misla, and having Ramos leave Puerto Rico. Misla argues that because Misla's tampering was directed at Ramos, a "plan instituted by conspirators to provide a false story to protect themselves cannot constitute witness tampering." Def. Brief at 45. He claims that, because he did not know that Ramos was already cooperating, he did not have the necessary intent to commit the crime of witness tampering.

Section 1512(b) states, in relevant part:

> Whoever knowingly . . . corruptly persuades another person, or attempts to do so, . . . with intent to influence, delay, or prevent the testimony of any person in any official proceeding [or] cause or induce any person to withhold testimony . . . shall be fined under this title or imprisoned not more than ten years, or both.[13]

In his brief, Misla argues that he could not have known that Ramos was a "witness," given that he believed they were still co-conspirators, and thus he lacked the necessary intent. That argument is off the mark, since it focuses on the status of the person, rather than the proceedings. The key is not whether the defendant knows or doesn't know that someone is a "witness" (a term not in the text of the statute), but rather whether he is intending

---

[13]Persuading or trying to persuade a potential witness to testify to something other than the persuader's "true belief" counts as "corruptly persuading" a person under § 1512. Cruzado-Laureano, 404 F.3d at 487.

-32-

to head off the possibility of testimony in an "official proceeding."

What's necessary is that there be sufficient evidence that the defendant knew that an official proceeding[14] had begun, or that he believed one to be likely in the future, and that he intended to influence any possible testimony in that proceeding. See United States v. Frankhauser, 80 F.3d 641, 652 (1st Cir. 1996) (analyzing § 1512(b)(2)(B)); United States v. Kelley, 36 F.3d 1118, 1128 (D.C. Cir. 1994) ("The statute only requires that the jury be able reasonably to infer from the circumstances that [the defendant], fearing that a grand jury proceeding had been or might be instituted, corruptly persuaded persons with the intent to influence their possible testimony in such a proceeding."). However, while the proceeding need not be imminent, 18 U.S.C. § 1512(e)(1), it must be more than merely foreseeable, Frankhauser, 80 F.3d at 652. To hold otherwise would allow a witness tampering charge in, e.g., any conspiracy where the co-conspirators agreed to a story at the outset of the conspiracy, merely because they had foreseen a possibility of eventual arrest and trial. This is the class of cases in which Misla would like to place himself.

His efforts to do so are unsuccessful. There was substantial evidence that Misla believed an investigation to be

[14]An "official proceeding" includes federal trials and federal grand jury investigations. United States v. Frankhauser, 80 F.3d 641, 651 (1st Cir. 1996)

-33-

likely and forthcoming when he began his attempts to persuade Ramos. Indeed, Ramos testified, regarding his first taped conversation with Misla:

> A.    [Ramos] . . . So I went to Mr. Edison Misla and I told him, "Edison, we are being investigated."
>
> He said, "I'm going to send my attorney to investigate at the U.S. Attorney's Office if I'm a target."
>
> . . .
>
> Q.    [Prosecution] Sir, when you used the word target, what do you mean by that?
>
> A.    A target is the object of an investigation being held.
>
> Q.    Did you continue having conversations with Edison Misla concerning this investigation?
>
> A.    That's right . . . . And then one or two days later he told me that he had sent his attorney, and his attorneys had gone to the federal U.S. Attorney's Office and spoken to prosecutor Gil and yourself, and that you had told him that Mr. Misla was not a target.

Tr. 12/2/02 at 13.

It is thus clear that Misla was aware of an ongoing investigation and the likelihood of a future official proceeding, and any of the later conversations with Ramos were directed at influencing or preventing Ramos's possible testimony in such a proceeding. See United States v. Freeman, 208 F.3d 332, 338 (1st Cir. 2000) (finding evidence sufficient where defendant knew of investigation, and knew that his own conduct might subject him to criminal liability). It is immaterial whether or not Misla knew or believed that Ramos was already cooperating. Indeed, it's

-34-

immaterial whether Ramos actually was cooperating, or even that he actually testify at all.  See United States v. Risken, 788 F.2d 1361, 1369 (8th Cir. 1986) ("witness status is expressly not required under § 1512, which specifically refers to 'persons' and not 'witnesses'").[15]  There was sufficient evidence for the jury to believe that Misla, fearing the results of an investigation that he knew was ongoing, attempted to persuade Ramos to change or withhold testimony, and that ends the matter.

**E. Sentencing**

### 1. Guidelines Calculation

Misla contends that the district court erred in calculating his Sentencing Guidelines range.  In particular, he challenges the enhancement for more than one bribe being involved, the imposition of a fine, and the enhancement for the amount of loss.  These objections were properly preserved for appeal.  We review the district court's interpretation of the sentencing guidelines de novo and the factual findings underlying the sentence for clear error.  See, e.g., United States v. Meada, 408 F.3d 14, 24 (1st Cir. 2005).

Section 2C1.1(b)(1) of the Sentencing Guidelines calls for a two-level increase to the base offense level for extortion

---

[15]It is also immaterial that the U.S. Attorney's Office told him he was not a target.  First, a jury could find that he still feared that he could become a target later.  Second, the statute does not require that the person attempting to tamper with a witness actually be the target of the official proceeding.

-35-

where more than one bribe is involved. Section 1B1.3 states that, when calculating the base offense levels under Chapter Two of the Guidelines, a sentencing court should include, "in the case of a jointly undertaken criminal activity . . . , all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Misla contends here that he should not be held accountable for the bribes of his co-defendant Cruz, because he had no knowledge of them.

Misla raised this issue below, and the district court held that, even if Misla didn't know about specific bribes, it was reasonably foreseeable to him that Cruz would receive a bribe. The court pointed to a lunch meeting arranged by a lobbyist whom CAS and Ramos had hired to introduce Ramos, De Jesús, and Ramírez to Cruz, the head of the legal department at PRDH and central to getting PRDH's approval for CAS's purchase of the CHC management contract. Cruz would eventually take a bribe from the group in order to secure approval. Ramos testifed:

Q. [Prosecution] Do you know, sir -- if you know -- did José Gerardo Cruz Arroyo request anything in exchange from Dr. DeJésus [sic] for giving the okay to this transaction?

A. [Ramos] All I remember is a conversation with Dr. DeJésus where he told me that he was taking care of everything.

. . .

Q. When Dr. DeJésus told you he was taking care of everything, did he explain to you what he was taking care of and what he was doing?

A. At that moment, he didn't, but later on I realized what was going on.

Q. What did you realize later on that was going on?

A. Well, I discovered that a car was being paid for him. And then months later, after he left in December the Department of Health, I realized that he had been forced to get a contract and work with the CAS Management office.

Q. [Prosecution] When you say he had been forced, who is "he"?

A. [Ramos] Dr. DeJésus Toro had forced the management to give work to attorney José Gerardo Cruz.

Tr. 11/27/02 at 8-9. Misla argued at sentencing, based on testimony in the case, that Ramos only mentioned Cruz to Misla once, and that it was prior to Cruz receiving the car Ramos testified to above. Therefore, he argues, the only time Misla heard anything about Cruz, he could not have heard about a bribe.

The court held that a later piece of testimony by Ramos about that meeting with Misla called that inference into question:

Q. So on this first occasion, sir, what is it that you explained, to the best of your recollection, to Edison Misla?

A. I called him and explained to him, explained what our objective was, which was to purchase the hospital, that he knew about it, that we had already spoken to Freddy Valentin, and that the contact had already been made with [José] Gerardo Cruz, with attorney [José] Gerardo Cruz, and that all that was left was for us to obtain the favor from the Government Development Bank.

Id. at 24. The court held that, because of this meeting and conversation, it was reasonably foreseeable to Misla that Cruz was

-37-

being bribed, like himself, for his participation in the scheme. We cannot say that this finding was clearly erroneous.

Misla next argues that the court erred in fining him $12,500, the bottom of the applicable range of $12,500 to $500,000. Under the Sentencing Guidelines, "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2. We review a sentencing court's imposition of fines for abuse of discretion. United States v. Savoie, 985 F.2d 612, 620 (1st Cir. 1993). "The defendant bears the burden of demonstrating that his case warrants an exception to the rule that a fine be imposed." United States v. Peppe, 80 F.3d 19, 22 (1st Cir. 1996). Misla concedes that he withheld information on his finances during the preparation of the presentence report (PSR). Because of this, the court held, he had not met his burden of showing that he would be unable to pay.

Misla now points to his objection to the PSR, in which he stated that his "only source of income to be able to pay a fine would be his monthly pension. The pension is used to satisfy his debts, as already listed in the report." The judge did not abuse her discretion in deciding that this was insufficient to meet Misla's burden.

Finally, Misla argues that the combination of the $12,500 fine and the $147,000 forfeiture violates the Eighth

Amendment. We pause only to note that forfeiture will violate the Eighth Amendment only if it is "grossly disproportional to the gravity of the defendant's offense." United States v. Bajakajian, 524 U.S. 321, 328 (1998); see United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005). As we discuss in Section II.E, infra, it is not grossly disproportional, and neither is its combination with a fine that is less than three percent of the allowable fine under the Guidelines.

### 2. Booker Error

Misla argues that the district court erred in sentencing him under a mandatory guidelines system. Here, he relies on the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). However, he concedes that he did not preserve this claim of error. As a result, our review is only for plain error. United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005). We will find such error only if "the defendant [points] to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' Booker regime." Id. First, we note that Misla's sentence of 71 months' imprisonment is right in the middle of the Guidelines range of 63 to 78 months, evidence that the judge was comfortable with the Guidelines range. Furthermore, Misla raises only the same objections he made to the Guidelines calculation itself. Those issues having been resolved in favor of

the government, we see no reasonable probability that the judge would have sentenced differently under an "advisory Guidelines" system.

## F. **Forfeiture**

### 1. Money Judgment

Misla's challenge to the forfeiture order involves a question that often comes up in cases where the government seeks criminal forfeiture of cash, rather than specific property. Pursuant to Rule 7(c)(2) of the Federal Rules of Criminal Procedure, the government gave notice in the indictment of an intent to seek forfeiture of all property involved in, or traceable to, the money laundering offense. It later filed a Bill of Particulars pointing to specific property it alleged was traceable to the money laundering proceeds, including an apartment in Luquillo, Puerto Rico. The government did not mention in the indictment any intent to seek substitute assets in lieu of the property it named as traceable to the proceeds of the offense.

After the verdict, the government moved for a judgment of forfeiture under Rule 32.2 of the Federal Rules of Criminal Procedure, and a hearing was held. At the hearing, the government stated an intention to go after only cash, rather than the real property that had been in the Bill of Particulars. The government also stated that it did not intend to seek forfeiture of any substitute assets. Misla argued that the government was not in a

position to ask for forfeiture of cash because they had not identified any particular pool of cash that could be traceable to the money laundering. The court ordered forfeiture of $147,400, pointing to specific checks that the government had provided as exhibits.

On appeal, Misla makes a subtle, but ultimately unavailing, argument. He says that any attempt by the government to seize cash is equivalent to seizing substitute assets, because the original proceeds of the offense are no longer available, and that is something that the government expressly declined an interest in doing. It being therefore impossible to execute this forfeiture order, he argues, the order should not have been issued in the first place. He also argues that it would be too late now for the government to try to seek any substitute assets, since he was given no notice in the indictment of an intent to do so.

As to his first point, we have said that

> [a] money judgment permits the government to collect on the forfeiture order in the same way that a successful plaintiff collects a money judgment from a civil defendant. Thus, even if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order.

United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006); see United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) ("[C]riminal forfeiture may take several forms [including] an in personam judgment against the defendant for the amount of money the

defendant obtained as proceeds of the offense."). Here, the government sought a forfeiture judgment under Rule 32.2, which provides that "[i]f the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1). This is in contrast to where the government seeks forfeiture of "specific property," in which case the government has to show a "nexus between the property and the offense." Id.

Misla is mistaken, therefore, in arguing that a forfeiture order can apply only to the specific proceeds of the offense. If the government seeks, and the court grants, a money judgment[16] as part of the forfeiture order, then "the government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction." Hall, 434 F.3d at 59. If the government has proven that there was at one point an amount of cash that was directly traceable to the offense, and that thus would be forfeitable under 18 U.S.C. § 982(a), that is sufficient for a court to issue a money judgment, for which the

---

[16]The district court's order is not as explicit as we would like in this regard. The order of forfeiture could be read as referring only to the specific funds that were laundered, though the subsequent judgment includes an unambiguous order to forfeit $147,400 in cash. Misla does not pursue this point on appeal, so we assume here that a money judgment was entered against him. This position is bolstered by the transcript of the forfeiture hearing, in which the long discussion between the judge and the attorneys centered specifically around the power of the judge to enter a money judgment, rather than an order to forfeit the specific traceable proceeds.

defendant will be fully liable whether or not he still has the original corpus of tainted funds -- indeed, whether or not he has any funds at all.

The question of how the government can <u>enforce</u> that judgment is a somewhat different question, however. There is a split of authority as to whether the government can seize assets with a money judgment just as any judgment creditor could, or whether the government must follow the substitute assets provisions of 21 U.S.C. § 853(p)[17] (we discuss the dispute briefly below). Here, however, we need not answer that question, because it does not appear from the record that the government has yet taken any action to enforce the judgment. We note, however, that, contrary to Misla's assertion, the government would not be constrained from seeking forfeiture of substitute assets under § 853(p) in the future. Misla argues that the government's disclaimer at the forfeiture hearing of an intent to seek substitute assets, coupled with the lack of any notice of an intent to do so in the indictment, would be fatal to any later attempts to go after substitute assets. If this were true, Misla's objection to the forfeiture order would have some teeth. But it is not true.

"Criminal forfeiture orders are something of a mongrel," <u>United States</u> v. <u>Hurley</u>, 63 F.3d 1, 23 (1st Cir. 1995), and this

---

[17]18 U.S.C. § 982(b)(1) incorporates 21 U.S.C. § 853, with the exception of subsection (d).

fact seems to have confused Misla. Although the government must include in the indictment notice of which property it plans to seek forfeiture of, Fed. R. Civ. P. 7(c)(2), that notice is only as to particular property, not as to particular statutory elements. Even though it must be mentioned in the indictment, forfeiture is not a substantive element of an offense, but is rather "an element of the sentence imposed <u>following</u> conviction." <u>Libretti</u> v. <u>United States</u>, 516 U.S. 29, 38-39 (1995) (emphasis in original); <u>see</u> <u>United States</u> v. <u>Moffitt, Zwerling & Kemler, P.C.</u>, 83 F.3d 660, 664-65 (4th Cir. 1996). Section 982 says simply that "[t]he court, in imposing sentence . . . shall order" the forfeiture of property "involved in" or "traceable to" the offense. 18 U.S.C. § 982(a)(1). And in cases where, <u>inter</u> <u>alia</u>, the original property "cannot be located upon the exercise of due diligence" or "has been transferred or sold to, or deposited with, a third party" then "the court shall order the forfeiture of any other property of the defendant." 21 U.S.C. § 853(p)(1)(A) & (B), (2). All that is necessary, therefore, for a court order to issue is that these conditions be met. No additional notice is necessary.[18]

In <u>Hurley</u>, we allowed an order for substitute assets to be entered after the case had already been appealed, which would

---

[18]Even if notice were to be required, there was plenty. The government asked for forfeiture under 18 U.S.C. § 982, without specifying a subsection. § 982 expressly incorporates 21 U.S.C. § 853. 18 U.S.C. § 982(b)(1). Thus § 982 also incorporates the substitute assets provision at § 853(p).

imply that the government could ask for such an order at any time. 63 F.3d at 23-24.  We noted there that "the government might not even know that substitution is necessary until it seeks to take possession of the property specified in the initial forfeiture order."  Id.; see United States v. Voigt, 89 F.3d 1050, 1088 (3d Cir. 1996) (on remand to apply the substitute assets provision, no de novo hearing necessary).

In Candelaria-Silva we said that "[t]he forfeiture of substitute assets is a matter left solely to the court."  166 F.3d at 43.  In that case the parties chose, unlike here, to have the forfeiture amount tried to a jury, which determined that $6,000,000 in proceeds was the asset subject to forfeiture.  But, we said, "the jury has no role in determining, subsequently, whether the property has been dissipated and whether the government is thereby entitled to the forfeiture of substitute assets."  Id.  All we said that was necessary for the government to show was that the principal forfeitable property was not available.  Id. at 42.  This is where the burden of the government lies: in showing that the principal forfeitable assets -- that is, those named in the indictment -- are unavailable at the end of the trial, not in giving notice at the beginning of the trial of an intent to invoke the substitute assets provisions.  Indeed, to allow the failure to specifically name the substitute assets provision of the forfeiture statute in the indictment -- or the substitute assets themselves --

to defeat any later attempt to go after substitute assets would allow defendants to avoid forfeiture simply by transferring away the assets after the indictment has come down. See United States v. Hatcher, 323 F.3d 666, 673 (8th Cir. 2003) ("The defendant does not need to know the identity of the substitute assets to marshal a defense to the forfeiture. Accordingly, [it is] not require[d] that the indictment specify what property will be sought as substitute assets.")

If the government instead acts to enforce the money judgment without using the substitute assets provisions of § 853(p), it raises the question of whether that is permitted, which is a question we need not reach here.  The question is important, since § 853(p) places a greater burden on the government before assets can be seized.  There is some split of authority among the circuits on whether the government must follow the procedures of § 853(p) or not.  See, e.g., United States v. Vampire Nation, 451 F.3d 189, 202 (3d Cir. 2006) ("[T]he in personam forfeiture judgment may also be distinguished from a general judgment in personam.  The judgment in personam here is one in forfeiture and is limited by the provisions of [§ 853]."); Hall, 434 F.3d at 59 (noting that a forfeiture money judgment is equivalent to a civil judgment, though that issue was not directly before the court).

In summary, a court may properly issue a money judgment as part of a forfeiture order, whether or not the defendant still

retains the actual property involved in the offense, or any property at all. Furthermore, the money judgment can be used in the future to seek forfeiture of substitute assets by court order under § 853(p) and Rule 32.2, even where the government has not expressed an intent to do so at any time before it seeks such an order. We leave for another day the question of whether, in seeking to seize assets to satisfy that judgment, the government is required to do so under the substitute assets provisions of § 853(p), or whether it may use the judgment to attach assets just like any other judgment creditor could.

### 2. Forfeiture Amount

After reviewing the record we find that the judge made no error in calculating the forfeiture amount. The $147,400 amount is supported by checks entered into evidence and testimony of Ramos that the funds from the checks were delivered to Misla. Misla attempts some arithmetical sleight of hand to arrive at a lower figure, but he and the government largely agree on the characterization of most of the checks. They differ only as to the checks made out to Francisco Diez and Raul Ferrer (exhibits 89 and 91) and one $10,000 check Ramos received from the hospital (exhibit 94).

Misla argues that the government stated at the forfeiture hearing that the Diez and Ferrer checks were not included in the forfeiture calculation. In fact, the government stated only that

Diez's check was not included; it did not disavow the Ferrer check. Moreover, even the disavowal of the Diez check was oversight on the government's part; the Diez check was included in the forfeiture calculation, and the government pointed to the evidence and testimony in the record supporting its inclusion in the forfeiture amount. As to the $10,000 check, Misla simply misreads the testimony. Misla argues that two $10,000 checks constituted Ramos's salary and thus should not have been considered. In fact, only the second of the two $10,000 checks constituted Ramos's salary. He testified that he gave Misla either $9000 or $9500 of the first $10,000, and the government relied on the lower figure in calculating the amount. There was no error.[19]

### III. Conclusion

For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.

---

[19]Misla makes an additional argument tying back to his earlier argument regarding the money judgment and substitute assets, namely that he can only forfeit those amounts still in his possession and unspent. As discussed above, this argument is unavailing to him.